PEOPLE v PHELPS

Docket No. 288999. Submitted February 2, 2010, at Grand Rapids. Decided April 13, 2010, at 9:00 a.m.

Kenneth J. Phelps was convicted of first-degree criminal sexual conduct (CSC I) and third-degree criminal sexual conduct (CSC III) following a bench trial in the Allegan Circuit Court, George R. Corsiglia, J. Defendant appealed.

The Court of Appeals *held*:

1. In determining whether the prosecution presented sufficient evidence to sustain a conviction, the reviewing court must consider the evidence in a light most favorable to the prosecution and consider whether there was sufficient evidence to justify a rational trier of fact's finding that all the elements of the crime were proved beyond a reasonable doubt.

2. There was sufficient evidence to support defendant's CSC I conviction. MCL 750.520b(1)(f) provides that a person is guilty of CSC I if he or she uses force or coercion to engage in sexual penetration with another person and causes personal injury. The definition of "force or coercion" includes the use of concealment or surprise to accomplish the sexual penetration. While the 16-year-old complainant had engaged in some consensual sexual acts with defendant, a 24-year-old man, he used the element of surprise to engage in acts of penile-vaginal penetration to which the complainant did not consent. A rational trier of fact could also have concluded that the penetration occurred through the use of actual physical force. Under MCL 750.520h, the complainant's testimony did not need to be corroborated.

3. There was also sufficient evidence to support defendant's CSC III conviction under MCL 750.520d(1)(b), which prohibits sexual penetration through the use of force or coercion. By performing cunnilingus on the complainant immediately after he withdrew his penis from her vagina, defendant seized control of the complainant in a manner to facilitate the accomplishment of sexual penetration without regard to her wishes at a time when she was in shock or surprise, and defendant did not stop when the complainant told him to.

4. In calculating defendant's recommended minimum sentence range under the sentencing guidelines, the trial court did not err by assessing 10 points for offense variable (OV) 10 (exploitation of a vulnerable victim), MCL 777.40(1)(b). Defendant exploited the complainant for selfish purposes. He manipulated the complainant into engaging in sexual acts with him and allowing him to be in a position in which he could engage in nonconsensual intercourse. The complainant was vulnerable because it was readily apparent that she was susceptible to physical restraint, persuasion, or temptation given her age and immaturity.

5. The trial court erred by assessing 10 points for OV 9 (number of victims), MCL 750.39(1)(c), because two to nine victims were not placed in danger of physical injury or death and no victims were placed in danger of property loss. Defendant committed criminal sexual conduct crimes against one victim only, the complainant. Although two of the complainant's friends were in her bedroom while the offense occurred, nothing in the record suggested that they were ever placed in danger of physical injury, loss of life, or loss of property. Defendant did not threaten anyone, and he did not make physical contact with either of the complainant's friends. The error requires resentencing because assessing zero points for OV 9 would result in a lower recommended minimum sentence range.

6. The trial court did not abuse its discretion by assessing zero points for OV 13 (continuing pattern of criminal behavior), MCL 777.43, because defendant had not engaged in a pattern of felonious criminal activity involving three or more crimes against a person within a five-year period. With respect to one of the three incidents alleged by the prosecution, defendant was not charged with a crime, and the evidence merely established that he was accused of wrongdoing.

7. The failure of defendant's counsel to object to the scoring of OV 9 and OV 10 did not deny defendant the effective assistance of counsel.

Convictions affirmed; case remanded for resentencing.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Frederick Anderson*, Prosecuting Attorney, and *Judy Hughes Astle*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Marla R. McCowan* and *Jacqueline C. Ouvry*) for defendant.

Before: TALBOT, P.J., and WHITBECK and OWENS, JJ.

PER CURIAM. Defendant Kenneth Phelps appeals as of right his convictions of first-degree criminal sexual conduct (CSC I)[1] and third-degree criminal sexual conduct (CSC III).[2] Following a bench trial, the trial court convicted Phelps and sentenced him as a second-offense habitual offender[3] to imprisonment for 23 to 45 years for the CSC I conviction and imprisonment for 14 to 22 years and 6 months for the CSC III conviction. We affirm Phelps's convictions, but remand for resentencing.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On December 21, 2007, CJ, age 19, and DH, age 14, went to visit their friend, the complainant, age 16, at the complainant's residence. The complainant lived with her mother, her brother, who was also age 16, and her older sister in a doublewide trailer at a trailer park in Wayland, Michigan. CJ and DH arrived at the complainant's residence at about 6:00 p.m. that evening and socialized with the complainant, her brother, and another friend, J. As the evening progressed, the complainant drank three or four cans of beer.

That same evening, Phelps was spending time with his friends (apparently in the same trailer park), smoking marijuana, and drinking four or five "double shots" of Jack Daniel's whiskey. In the early morning hours of December 22, 2007, after the complainant's mother had gone to bed, sometime between 12:00 and 1:30 a.m., Phelps, age 24, left his friend's residence and noticed

---

[1] MCL 750.520b(1)(f) (use of force or coercion causing personal injury).

[2] MCL 750.520d(1)(b) (use of force or coercion).

[3] MCL 769.10.

that the complainant's brother's bedroom light was on. Phelps, a friend of both the brother and J, stopped and knocked on the brother's window, and the three friends began talking. At some point, Phelps climbed through the brother's window, sat in the bedroom, and continued conversing with his two friends. After Phelps entered the trailer, CJ, DH, and the complainant all went into the brother's bedroom and joined the conversation. The individuals talked in the brother's bedroom and in the living room of the trailer. The complainant had previously met Phelps on one occasion, and Phelps was aware that the complainant was either age 16 or 17. The complainant testified that a short while after Phelps arrived at the trailer, she conversed with him about the fact that she was still a virgin, and she told him that she was not ready to lose her virginity.

Eventually, the complainant, CJ, and DH retreated to the complainant's bedroom, while Phelps, the brother, and J went into the brother's bedroom located directly across a small six-foot-wide hallway-like space. Sometime thereafter, the complainant informed CJ and DH that she thought Phelps was "cute." CJ and DH then went into the brother's room and encouraged Phelps to go into the complainant's bedroom to "make out" with her. DH testified that she merely encouraged Phelps to give the complainant a "goodnight kiss." Phelps agreed and went into the complainant's room and sat on an air mattress with the complainant and began kissing her while CJ and DH remained in the room. The physical contact between Phelps and the complainant progressed. The two fondled each other, and Phelps removed the complainant's jeans. She consented when he digitally penetrated her vagina and performed cunnilingus on her. CJ and DH remained in the room while the sexual acts took place, but both testified that they were talking to each other and were unaware of what was

occurring other than the kissing. The complainant testified that Phelps asked her to touch his penis, but she refused. Phelps also asked the complainant to have sex with him, but she again refused. During this first encounter in the bedroom, Phelps accepted the complainant's assertion that she did not want to have "sex," and at some point, he went outside the trailer and smoked cigarettes with the brother and J.

About 15 or 20 minutes later, at approximately 2:00 or 3:00 a.m., Phelps returned to the complainant's bedroom. The complainant and Phelps both testified that CJ asked Phelps to return to the room to once again kiss the complainant. The complainant testified, however, that she told her friends not to go get Phelps a second time. However, CJ and DH testified that they were sleeping and that the lights were turned off when Phelps entered the bedroom the second time and climbed into bed with the complainant. All four individuals gave differing testimony regarding what occurred next.

The complainant testified that Phelps entered the room, got into her bed, and began kissing her. According to the complainant, she again consented when Phelps removed her clothing and digitally penetrated her vagina. According to the complainant, Phelps then penetrated her vagina with his penis. The complainant testified that Phelps's conduct of penetrating her with his penis caught her by surprise. According to the complaint, she told him no and that she did not "want to." The complainant testified that she told Phelps "no like 5 times," but Phelps refused to stop. The complainant testified that Phelps eventually pulled his penis out of her vagina but immediately began performing oral sex on her. The complainant stated that she then told Phelps to stop performing oral sex, but he refused until

she yelled for him to get off her and CJ turned the bedroom light on. The complainant testified that Phelps was on top of her when the intercourse occurred and was sitting on the floor next to the bed when he performed oral sex on her after the intercourse.

Phelps gave a different account of his second encounter with the complainant. He testified as follows:

> [W]e started making out again, rubbing on each other, started with fingering . . . . I asked her a couple times if she wanted to go any further, if she wanted to do anything else and her friends had joined in the conversation and we ended up all 3 of us, or 4 of us rather were talking about, you know, pro's and con's I guess you would say of different sexual things we could do or couldn't do or whatever.

Phelps explained that CJ and DH "encouraged" the complainant and "told her you know, well yeah if you want to go ahead and do it if you want to type of thing." Phelps continued his testimony as follows:

> *Q.* [by defense counsel] Did you ask her if she wanted to have intercourse or what did you say?
>
> *A.* Yeah, I asked her—I asked her earlier if she wanted to have intercourse and she wasn't sure. I said so what do you want to do and she says well alright, and I said are you sure, and then she said. Then I engaged in penile/vaginal penetration.
>
> * * *
>
> *Q.* Did she say anything out loud or anything at that time?
>
> *A.* A couple seconds later she was like stop, and I didn't hear her at first and she said stop again and I said what's wrong and she says it hurts, and so I stopped and I pulled my penis out of her and I said well let me help you climax through cunnilingus, . . . that's the gist of what I told her, and she said okay, just kind of mumbled okay and I went to

do that and then a couple seconds after that she's like no, stop, that doesn't feel right either, I just don't want to do nothing no more. So, as I was sitting up the light came on and I looked at her friends . . . and I noticed there was blood on the mattress there . . . and at that point I left the room and went into the bathroom to wash up. When I came back out of the bathroom . . . [DH] told me that . . . [the complainant] was saying that I had raped her, but that neither [DH] nor anybody else knew why [the complainant] was saying this.

CJ testified that she did not encourage Phelps and the complainant to have sex and was awakened when the complainant yelled at Phelps to "stop now and get off" in a scared voice. At that point, CJ turned the bedroom light on and saw Phelps's face covered in blood. She then turned the light back off and told Phelps to get out. CJ explained that she turned the light off again because it was "a disturbing sight . . . ."

DH also testified that she did not encourage the complainant to have sex with Phelps, and she explained that she was awakened when the complainant yelled, "[N]o, get off me, I don't want to do this, and she was just yelling, and then we just got up." According to DH, the complainant was crying, and when the lights went on, she saw Phelps on the floor near the side of the bed near the "middle" of the complainant's body. DH saw Phelps's face was covered in blood, and she ran out of the room at that point. After Phelps left the bedroom, CJ explained that the complainant sat on the bed "freaking out," almost crying, and then she went outside with CJ and DH where she cried and was "pretty upset." Both CJ and DH convinced Phelps to leave the trailer. Phelps testified that he left the residence after both CJ and DH informed him that the complainant was upset and would not reenter the trailer while Phelps was still present.

On the evening of December 22, 2007, the complainant went with her mother to the YWCA at approximately 9:00 p.m., where nurse examiner Sara Koster performed a sexual assault examination (using what is commonly called a "rape kit"). At trial, Koster testified as an expert in sexual assault trauma identification and treatment. Koster performed a full physical examination of the complainant, and she discovered four injuries related to the sexual activity: (1) a tear in the cervix that was bleeding, which Koster testified is usually caused by digital penetration; (2) a tear at the posterior fourchette, which is a fold of skin on the outside of the opening to the vagina into the vaginal wall (Koster testified that this tear is normally caused by penile-vaginal penetration); (3) redness and swelling of the clitoris; and (4) a tear in the hymen, which Koster testified is normally consistent with penile-vaginal penetration but could be caused by digital penetration. Koster explained that the complainant's injuries appeared painful and were bleeding, but no treatment was necessary because that area of the female body generally heals itself. According to Koster, some virgins suffer injuries similar to the complainant's the first time they have sex, but some do not.

Near the end of March 2007, Officer Trina Sims of the Michigan State Police spoke with Phelps after having a difficult time locating him. Phelps told Officer Sims that he had consensual sex with the complainant and that he stopped having intercourse when she said "no, no, no stop." Lieutenant Harris Edwards, a forensic science interview specialist with the Michigan State Police, interviewed Phelps after his arrest. Phelps waived his constitutional rights and voluntarily spoke with Lieutenant Edwards. Lieutenant Edwards testified regarding Phelps's statements during the interview:

He said that both himself and [the complainant] were messing around and making out. He initially advised me . . . that the two other young ladies that were there had brought it to his attention that [the complainant] was interested in him, that she liked him, and so he conversed with her. He told the two young ladies that he probably shouldn't be messing with this girl because he knew she was 16 and he's been in trouble before for messing with young girls.

\* \* \*

We talked a little bit more about the, you know, if he had felt he had done anything wrong that day and he was very cooperative and saying yes, and hindsight is 20/20 and I should have never messed with her and she was 16, he felt that she was too immature to make a decision like [sic].

Following the close of proofs, the trial court found Phelps guilty of CSC I and CSC III. Phelps now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Phelps argues that the prosecution failed to present sufficient evidence to show that he used force or coercion to accomplish sexual penetration with the complainant. We review de novo a challenge to the sufficiency of the evidence.[4]

### B. APPLICABLE LEGAL PRINCIPLES

In determining whether the prosecution presented sufficient evidence to sustain a conviction, we construe the evidence in a light most favorable to the prosecution and consider whether there was sufficient evidence to justify a

---

[4] *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002).

rational trier of fact in finding that all the elements of the crime were proved beyond a reasonable doubt.[5]

MCL 750.520b(1)(f) provides that a person is guilty of CSC I if that person uses force or coercion to engage in sexual penetration with another person and causes personal injury.[6] MCL 750.520b(1)(f)(*v*) defines "force or coercion" as including the use of concealment or surprise to accomplish the act of sexual penetration. MCL 750.520d(1)(b) provides that a person is guilty of CSC III if that person engages in sexual penetration through the use of "force or coercion." MCL 750.520d(1)(b) provides that "[f]orce or coercion includes but is not limited to any of the circumstances listed in [MCL 750.520b(1)(f)(*i*) to (*v*)]." "The existence of force or coercion is to be determined in light of all the circumstances . . . ."[7] "[T]he prohibited 'force' encompasses the use of force against a victim to either induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment of sexual penetration without regard to the victim's wishes."[8] Further, in a prosecution for CSC I or CSC III, "[a] victim need not resist the actor,"[9] and "[t]he testimony of a victim need not be corroborated . . . ."[10]

### C. APPLYING THE PRINCIPLES

#### 1. CSC I

We conclude that there was sufficient evidence to allow a rational trier of fact to conclude beyond a

---

[5] *People v Johnson*, 460 Mich 720, 722-723; 597 NW2d 73 (1999).

[6] See also *People v Nickens*, 470 Mich 622, 629; 685 NW2d 657 (2004).

[7] *People v Crippen*, 242 Mich App 278, 282; 617 NW2d 760 (2000).

[8] *People v Carlson*, 466 Mich 130, 140; 644 NW2d 704 (2002).

[9] MCL 750.520i.

[10] MCL 750.520h.

reasonable doubt that Phelps used force or coercion when he penetrated the complainant's vagina with his penis, causing personal injury. The evidence showed force or coercion through the element of surprise.[11] The complainant testified that, earlier in the evening before the offense occurred, she told Phelps that she was a virgin and did not want to lose her virginity. During their first consensual sexual encounter that evening, the complainant refused to touch Phelps's penis and told him "No" when he asked to have sexual intercourse with her. The complainant testified that when Phelps entered her bedroom the second time, she did not tell him that he could penetrate her vagina with his penis and that she was unaware that Phelps removed his pants. She consented only to digital penetration, and she testified that she was surprised when Phelps penetrated her vagina with his penis. In addition, the complainant was visibly upset and crying after the incident.

Even without additional evidence, the complainant's testimony that she did not give Phelps permission to have penile-vaginal intercourse, was engaged in a different consensual act with him, and was surprised when he inserted his penis into her vagina was sufficient to sustain a conviction of CSC I because "[t]he testimony of a victim need not be corroborated . . . ."[12] The evidence supported that Phelps used the element of surprise to overcome the complainant and engage in penile-vaginal intercourse. Although Phelps testified that the sexual intercourse was consensual, we will not interfere with the fact-finder's role of determining the weight of the evidence or the credibility of witnesses.[13]

---

[11] MCL 750.520b(1)(f)(v).

[12] MCL 750.520h.

[13] *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992).

There was also sufficient evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that Phelps penetrated the complainant's vagina through the use of actual physical force.[14] The complainant testified that Phelps was physically on top of her when he penetrated her vagina with his penis, and she explained that when she told Phelps no "around 5 [times], give or take a few," Phelps told her "no, I'm not done yet" and kept his penis inside her for approximately "[f]ive minutes" while she was underneath him and telling him no. Again, the complainant's testimony need not be corroborated to sustain a conviction of CSC I,[15] and this Court will not interfere with issues of the credibility of a witness or the weight of the evidence.[16]

### 2. CSC III

We also conclude that there was sufficient evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that Phelps used force or coercion when he performed cunnilingus on the complainant without her consent immediately after withdrawing his penis from her vagina.[17] Therefore, he was properly convicted of CSC III. The complainant testified that Phelps immediately began performing cunnilingus after he withdrew his penis from her vagina and refused to stop despite her repeatedly telling him to stop. According to the complainant, Phelps only stopped after CJ turned on the bedroom light. This evidence shows that Phelps "seize[ed] control of [the complainant] in a manner to facilitate the accomplishment of sexual penetration without regard to [the complainant]'s

---

[14] MCL 750.520b(1)(f)(*i*).

[15] MCL 750.520h.

[16] *Wolfe*, 440 Mich at 514-515.

[17] *Johnson*, 460 Mich at 722-723.

wishes."[18] Phelps was on top of the complainant when he engaged in intercourse, and when he withdrew his penis, he began performing cunnilingus while the complainant was lying on the bed in shock or surprise, and he refused to stop when she told him to.

According to CJ, the complainant was yelling in a scared voice, and when CJ turned on the light, Phelps had blood on his face. Although the complainant did not testify that she tried to physically resist Phelps or try to get up from the bed, "[a] victim need not resist the actor in a prosecution [for criminal sexual conduct]."[19] Phelps testified that the complainant "mumbled" her assent when he suggested that he perform cunnilingus, but, as stated earlier, the role of this Court is not to interfere with the fact-finder's role of determining the credibility of the witnesses and the weight of the evidence.[20]

### III. OFFENSE VARIABLE SCORING

#### A. STANDARD OF REVIEW

Phelps contends that the trial court erred in scoring offense variable (OV) 9 and OV 10 at sentencing. "This Court reviews a sentencing court's scoring decision to determine whether the trial court properly exercised its discretion and whether the record evidence adequately supports a particular score."[21] However, this issue also involves statutory interpretation, which this Court reviews de novo.[22] "Scoring decisions for which there is any evidence in support will be upheld."[23] And, ulti-

---

[18] *Carlson*, 466 Mich at 140.

[19] MCL 750.520i.

[20] *Wolfe*, 440 Mich at 514-515.

[21] *People v McLaughlin*, 258 Mich App 635, 671; 672 NW2d 860 (2003).

[22] *Id.*

[23] *People v Endres*, 269 Mich App 414, 417; 711 NW2d 398 (2006).

mately, Phelps is entitled to resentencing on the basis of a scoring error only if the error alters the recommended minimum sentence range under the legislative sentencing guidelines.[24]

### B. OV 10

MCL 777.40 governs the scoring of OV 10, exploitation of a vulnerable victim, and it provides in relevant part that 10 points must be assessed when "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status."[25] The statute defines "exploit" as "to manipulate a victim for selfish or unethical purposes."[26] "Vulnerability" is defined as "the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation."[27] We conclude that the trial court did not abuse its discretion in assessing 10 points for OV 10 because evidence on the record supported that Phelps "exploited" the complainant's youth and that the complainant was "vulnerable" within the meaning of MCL 777.40.[28] The complainant's age alone did not support the scoring of the offense variable. Rather, the record supported that her age and immaturity made her a vulnerable victim.

First, evidence on the record supported that Phelps exploited the complainant for selfish purposes by manipulating her into engaging in sexual acts with him and allowing him to be in a position in which he could

---

[24] *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

[25] MCL 777.40(1)(b).

[26] MCL 777.40(3)(b).

[27] MCL 777.40(3)(c).

[28] *Endres*, 269 Mich App at 417.

engage in nonconsensual sexual intercourse.[29] Phelps, a 24-year-old man, testified that he was aware that the complainant was only 16 or 17 years old, and he acknowledged that he had previous "trouble" with young girls. Phelps told the complainant's friends that he should not be "messing" with a young girl like the complainant. The complainant informed Phelps that she was a virgin and did not want to lose her virginity, and she refused to engage in intercourse or touch Phelps's penis when he asked her to do so. After the initial sexual encounter, despite knowing that the complainant did not want to have sexual intercourse or touch his penis, Phelps entered the complainant's bedroom a second time, when the lights were off, climbed into her bed, removed his clothing without the complainant's knowledge, and, while the complainant was in a compromised position, took advantage of the situation and inserted his penis into her vagina without her consent. Phelps admitted to the interviewing police officer that he coerced the complainant into engaging in sex with him. Phelps also admitted to the officer that the complainant was too immature to make the decision to have sex. Phelps testified that he tried to talk the complainant into having intercourse even after she said she "wasn't sure" because of his own "[s]elfish reasons."

Second, the evidence showed that the complainant was vulnerable because it was readily apparent that she was susceptible to physical restraint, persuasion, or temptation.[30] The complainant was in a compromised position when Phelps penetrated her with his penis. Phelps was physically on top of the complainant in a dark room. In this position, Phelps could physically

---

[29] MCL 777.40(3)(b).

[30] MCL 777.40(3)(c).

restrain the complainant while he engaged in intercourse, and he refused to withdraw his penis after the complainant told him to stop. The complainant was susceptible to persuasion or temptation to engage in sexual acts and to allow Phelps to be in a position in which he could penetrate her with his penis. The complainant was only 16 years of age and was a virgin. According to Phelps, he used the complainant's friends to apply peer pressure on her to allow him to engage in sex, and he acknowledged in the police interview that the complainant was too immature to make the decision to have sex with him. Nevertheless, according to Lieutenant Harris, Phelps "emphasized" in the interview that he "coerced" the complainant into engaging in sex with him and took advantage of her willingness to allow him to engage in certain sexual activities by inserting his penis into her vagina without her consent.

In sum, we conclude that the trial court properly scored OV 10.

### C. OV 9

MCL 777.39 governs the scoring of OV 9 and provides in relevant part that the trial court assess 10 points when "2 to 9 victims . . . were placed in danger of physical injury or death, or 4 to 19 victims . . . were placed in danger of property loss."[31] The statute defines "victim" as "each person who was placed in danger of physical injury or loss of life or property . . . ."[32] We conclude the trial court abused its discretion by scoring OV 9 at 10 points. There was no evidence on the record to support the conclusion that two people in this case were in danger of physical injury or loss of life or that

---

[31] MCL 777.39(1)(c).

[32] MCL 777.39(2)(a).

four people were in danger of loss of property when Phelps committed criminal sexual conduct crimes against one victim only.

The only evidence of injury in this case consisted of testimony by a YWCA nurse examiner that the complainant suffered internal injuries to her vaginal area. Although two of the complainant's friends were in the bedroom when the offense took place, nothing in the record suggested that they were ever placed in danger of physical injury, loss of life, or loss of property. Phelps did not threaten anyone, and he did not make physical contact with either of the complainant's friends.

We conclude that the trial court abused its discretion by assessing 10 points for OV 9. Rescoring OV 9 by assessing zero points[33] would result in a lower recommended minimum sentence range.[34] Thus, Phelps is entitled to resentencing.[35]

### D. OV 13

The prosecution argues that Phelps is not entitled to resentencing because the trial court should have assessed 25 points for OV 13, continuing pattern of criminal behavior, and any error with respect to scoring OV 9 would become harmless because it would not result in a lower recommended minimum sentence range. We disagree. After reviewing the record, we con-

---

[33] MCL 777.39(1)(d).

[34] For the CSC I conviction, Phelps's offense variable level was calculated at 65 points and his prior record variable level was calculated at 60 points, resulting in a recommended minimum sentence range of 135 to 281 months with habitual offender enhancement. Reducing the offense variable level by 10 points would result in a recommended minimum sentence range of 126 to 262 months. Phelps's minimum sentence for the CSC I conviction was 276 months. See MCL 777.16y and MCL 777.62.

[35] *Francisco*, 474 Mich at 89 n 8.

clude that the trial court did not abuse its discretion by scoring OV 13 at zero points because there was insufficient evidence to show that Phelps engaged in a pattern of felonious criminal activity involving three or more crimes against a person over the past five years, as defined in the statute.[36]

MCL 777.43 governs the scoring of OV 13 and provides in relevant part as follows:

> (1) Offense variable 13 is continuing pattern of criminal behavior. Score offense variable 13 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> *  *  *
>
> (c) The offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person ................................................................ 25 points
>
> *  *  *
>
> (2) All of the following apply to scoring offense variable 13:
>
> (a) For determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction.
>
> *  *  *
>
> (c) Except for offenses related to membership in an organized criminal group or that are gang-related, do not score conduct scored in offense variable 11 or 12.[37]

---

[36] MCL 777.43(1)(c) and (2)(a); *Endres*, 269 Mich App at 417.

[37] At the time of the offense, MCL 777.43(1)(c) was designated MCL 777.43(1)(b), but the language was identical. 2008 PA 562, which redesignated the subdivision, also added the language "or that are gang-related" to MCL 777.43(2)(c).

Before trial, the prosecution moved to admit evidence pursuant to MRE 404(b) of two instances of sexual misconduct involving Phelps. In the motion, the prosecution proposed to offer evidence that Phelps was convicted of fourth-degree criminal sexual conduct (CSC IV) in December 2005 after he engaged in sexual intercourse with a 14-year-old girl. The prosecution also proposed to offer evidence involving an August 2005 accusation that he engaged in forcible nonconsensual anal sex with an 18-year-old woman. Phelps was not charged in connection with the August 2005 incident.

The prosecution argues that Phelps engaged in a pattern of felonious criminal activity involving three or more crimes against a person (including the CSC I conviction in this case)[38] and thus, pursuant to MCL 777.43(1)(c), the trial court should have assessed 25 points for OV 13. The prosecution concedes that, under MCL 777.43(2)(c), Phelps's CSC III conviction in this case cannot be considered for purposes of scoring OV 13 because that offense was considered for scoring OV 11.

We conclude that the trial court did not abuse its discretion by assessing zero points for OV 13 because the evidence on the record did not support that Phelps engaged in a pattern of felonious criminal activity involving three or more crimes against a person within a five-year period.[39] There was evidence to show that Phelps committed *two* felonies against a person within the previous five-year period: Phelps was convicted of CSC I in this case and CSC IV in 2005. However, the

[38] MCL 777.43(2)(a); *People v McGraw*, 484 Mich 120, 135; 771 NW2d 655 (2009) ("Offense variables are properly scored by reference only to the sentencing offense except when the language of a particular offense variable statute specifically provides otherwise.").

[39] See *McLaughlin*, 258 Mich App at 671; *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002).

record evidence was insufficient to show that Phelps committed a *third* instance of felonious criminal activity against a person. With respect to the conduct involving the 18-year-old woman in August 2005, Phelps merely acknowledged that the woman had "accused" him, but Phelps was not charged with any criminal offense. The prosecution did not introduce any testimony of the woman or the police officer involved with the incident. Although a crime need not result in a conviction to be counted under OV 13,[40] Phelps's testimony merely established that he was accused of wrongdoing and did not sufficiently support that he engaged in felonious criminal activity against a person. In sum, the trial court did not abuse its discretion by assessing zero points for OV 13 when the record evidence did not support a higher score.

### IV. EFFECTIVE ASSISTANCE OF COUNSEL

Phelps argues that he was denied the effective assistance of counsel when counsel failed to object to the trial court's scoring of OV 9 and OV 10 at sentencing. In light of the relief afforded Phelps with respect to OV 9, we will not address Phelps's argument with respect to that variable. And with respect to OV 10, defense counsel did not act deficiently by failing to raise an objection to the assessment of 10 points for this variable because, as discussed previously, evidence on the record supported the trial court's scoring.[41]

We affirm, but we remand for resentencing consistent with this opinion. We do not retain jurisdiction.

---

[40] MCL 777.43(2)(a).

[41] See *People v Rodriguez*, 212 Mich App 351, 356; 538 NW2d 42 (1995) ("[C]ounsel is not required to make a groundless objection at sentencing.").