# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

AARON ANTWAUN ROBINSON,

Defendant-Appellant.

UNPUBLISHED
February 17, 2015

No. 319226
Genesee Circuit Court
LC No. 11-029956-FC

Before: SAAD, P.J., and OWENS and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for first-degree home invasion, MCL 750.110a(2), safe breaking, MCL 750.531, larceny of a firearm, MCL 750.537b, receiving and concealing a firearm, MCL 750.353b, and felony-firearm, MCL 750.227b. The jury acquitted defendant of first-degree felony murder, MCL 750.316(b), second-degree murder, MCL 750.317, carjacking, MCL 750.529a, and armed robbery, MCL 750.529. Defendant was sentenced to 144 to 240 months' imprisonment for the home invasion conviction, 140 to 360 months' imprisonment for the safe breaking conviction, 13 to 60 months' imprisonment for the larceny of a firearm conviction, 24 to 120 months' imprisonment for the receiving and concealing a firearm conviction, and 2 years' imprisonment for the felony-firearm conviction. The safe breaking, larceny of a firearm, and receiving and concealing a firearm sentences were to run concurrently to one another, but consecutively to the home invasion and felony-firearm sentences. The home invasion sentence was to run consecutively to the felony-firearm sentence. We affirm defendant's convictions, but remand for resentencing so that the trial court may articulate the justification for the extent of the departure from the recommended guidelines range.

## I. BASIC FACTS

In August 2011, the 77-year-old victim, former Genesee County sheriff's deputy Lonnie Thomas, Sr., was killed at 914 East Jamieson when he came home to a robbery in progress. There is no dispute that Ryan Deville, who was originally a co-defendant, fired the fatal shots. At issue during trial was defendant's participation and role during the events leading up to the victim's death. Defendant was originally charged with first-degree felony murder, second-degree murder, carjacking, armed robbery, first-degree home invasion, safe breaking, larceny of a firearm, receiving and concealing a firearm, and felony-firearm.

-1-

Friends of the victim were concerned when they could not reach the victim by phone. They went to his home and noticed that a truck was missing. Thinking that the victim was simply running errands, they waited for him to return. When the victim failed to return after a couple of hours, they called police. The victim was found dead on his couch. He had been shot multiple times. As the police were conducting the initial investigation, one of the victim's friends learned that the victim's truck was at a nearby convenience store. She alerted police, who arrested defendant.

An audiotape of defendant's first statement to Officer Terrence Coon was played for the jury. In it, defendant stated that Deville had picked him up in a blue Chevy Cobalt that Deville said belonged to his aunt.[1] They drove around until the car broke down. Defendant suggested that they break into the victim's home. Defendant was familiar with the victim, having previously lived down the street from him. Deville crawled through a window at the victim's home and then let defendant in through the door. Neither of them was armed. Defendant and Deville found numerous jars of coins and guns.[2] The two of them were in the victim's house when the victim returned. Defendant wanted to leave, but Deville fired a shot near defendant and threatened to kill him if he did not help. Defendant agreed and ducked into the kitchen; he heard three shots. They moved the victim's body to the couch in order to get him out of the way. They waited for the sun to go down before they loaded the victim's items into the victim's truck. Deville was worried about the body smelling, so they poured bleach on the victim and turned up the air conditioning. Deville covered the victim with a blanket. Defendant drove the pickup truck to Deville's friend's house, where they left several guns for safekeeping. After that, defendant dropped off Deville at his home and then proceeded to his girlfriend's grandmother's house. He tried to go back to "live my normal life" and "keep my mind off it" by going to a party and staying at a hotel room with his girlfriend.

Approximately a month later, defendant was interviewed by police a second time. Defendant told Sergeant Jeff Collins that he and Deville had talked about robbing the victim's home a couple of days before doing so. They began to monitor the victim's home and came up with a ruse to knock on the door and ask the victim if he needed his lawn mowed. The victim said that the lawn did not need to be mowed and that he was leaving shortly to go to the bank. At that time, defendant and Deville determined that they could enter the home through a window that had an air conditioner unit. They waited until the victim left and then entered the home. Defendant told Collins that Deville picked up a gun from a table and indicated that they were going to kill the victim when he returned. When defendant indicated that he was "not down with that," Deville fired a shot at him. When the victim arrived back home, defendant went to the kitchen area and heard three shots fired. He helped Deville move the victim's body to the couch and the two spent an hour in the house.

Defendant gave a third statement to police a full year after the crime was committed. Defendant told former Lieutenant David Dwyre that he lied about Deville threatening him.

---

[1] In fact, the car was stolen and the registration was found in Deville's home.

[2] By all accounts, the victim was a hoarder.

Defendant admitted that they planned the burglary, but there was never a plan to harm the victim. Dwyre suggested that defendant write a letter of apology to the prosecutor, which was admitted at trial.

Deville testified at defendant's trial. Like defendant, Deville was originally charged with first-degree murder, open murder, safe breaking, carjacking, armed robbery, first-degree home invasion, felony-firearm, larceny, and receiving and concealing stolen property. He pleaded guilty to second-degree murder and felony-firearm in exchange for the prosecutor dismissing the remaining charges.

Deville testified that it was defendant who drove the blue car. Deville testified that after the car broke down, defendant pointed out a white house and "said that that's the house we can get some money at." Deville was under the impression that defendant's grandfather lived there. They "scoped" it out, but it appeared someone was there. They knocked on the front door and the victim came to the door. Defendant asked the victim if he could come and help them fix the car. The victim said that he would take a look, but that he had to go somewhere first. Deville and defendant decided to walk around the block and by the time they made it back, a vehicle was missing from the victim's driveway.

Deville testified that defendant went through the window and let Deville in through the back door. Once inside, defendant pointed to a gun on a table and handed it to Deville. When Deville grabbed it "it went off and shot the TV." Deville denied threatening defendant or intentionally firing the weapon at defendant. They were "putting everything together" when the victim walked in. Deville believed that the victim would be within his right to shoot him and defendant, so Deville grabbed a gun off of the bed and shot the victim several times.

Deville testified that they laid the victim on the couch so they would not have to walk over his body. He covered the victim with a blanket and defendant poured bleach on the victim because a dead man was certain to smell.

During cross-examination, Deville denied being a member of the Bucktown Bloods. He did not know a man named Omar. And he did not know defendant's brother, Deante. Deville denied showing defendant a picture of defendant's brother "duck taped up."

In addition to defendant's three statements to police, the jury heard defendant's testimony at trial. Defendant testified that he previously lived across the street from the victim. On August 5, 2011, Deville picked up defendant in a blue car. Defendant explained that he showed Deville the victim's house because "if I didn't that they were gonna kill my brother." The trial court sustained the prosecutor's objection and no further questions were asked regarding defendant's brother. [3] Defendant testified that he had no intention of taking part in the robbery.

---

[3] The court later ruled all testimony regarding what Deville might have said as impermissible hearsay evidence.

Defendant testified that they could see the victim's driveway from where the blue car was parked in a vacant lot on Jamieson. When they saw the victim leave, they approached the house. Deville climbed through an open window that had an air conditioning unit and let defendant in through the back door. Deville showed defendant a handgun he had found and revealed that he intended to kill the victim when he came home. Deville fired a shot into a TV that defendant was near and threatened to kill defendant if he tried to leave.

Defendant testified that he was scared and told Deville that he would help. When they saw the victim returning, Deville ordered defendant to run to the kitchen. Defendant heard the door open and then heard three successive gunshots. Defendant helped Deville move the victim to the couch. Deville placed a blanket over the victim. Deville later went back and poured bleach on the victim.

Defendant testified that he did not remember much about his first interview with Coon. He also denied many of the statements in the handwritten notes from his interview a month later with Collins. As for the letter he wrote after talking to Dwyre, defendant testified that he was "led to believe that if I wrote it to the head prosecutor of this County that I would get a – a lesser timeframe deal then what they were already proposing for me." Dwyre told defendant what to write.

The jury acquitted defendant of felony murder, second-degree murder, carjacking, and armed robbery. It convicted defendant of first-degree home invasion, safe breaking, larceny of firearms, receiving and concealing stolen firearms, and felony-firearm. Defendant was sentenced as set forth above. He now appeals as of right.

## II. RIGHT TO PRESENT A DEFENSE

Defendant argues that he was precluded from presenting a duress defense when the trial court granted the prosecutor's motion to exclude any evidence that Deville threatened to harm defendant's brother, Deante, if defendant did not help rob the victim.

"Whether a defendant was denied his constitutional right to present a defense is a question of law we review de novo." *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

At trial, defendant testified that he only showed Deville where the victim lived because "if I didn't that they were gonna kill my brother." The trial court sustained the prosecutor's objection and no further questions were asked regarding defendant's brother. The court later struck any testimony regarding what Deville might have said as impermissible hearsay evidence. Defense counsel made an offer of proof regarding his questioning Deville about a possible gang affiliation and the fact that defendant's brother was originally held hostage by the gang. Defense counsel acknowledged that duress was not a defense to murder, but was potentially a defense in the underlying charges. At the close of proofs, defense counsel requested that a duress jury instruction be given. The trial court instructed the jury that defendant claimed duress as a result of a threat to his own life. The instruction did not include any reference to threats to a third party.

Our Court has noted:

-4-

There is no doubt that based on the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process or Confrontation Clauses, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Few rights are more fundamental than that of an accused to present evidence in his . . .own defense. But this right is not unlimited and is subject to reasonable restrictions. The right to present a complete defense may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. Michigan, like other states, has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials. And our Supreme Court has broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Thus, an accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. The Michigan Rules of Evidence do not infringe on a defendant's constitutional right to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve. [*King*, 297 Mich App at 473-474 (internal quotation marks and citations omitted).]

The evidence that defendant sought to introduce was clearly inadmissible hearsay. Hearsay is defined as a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible at trial. MRE 802. However, MRE 804(b) provides exceptions to the general rule. It provides, in relevant part:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

As the prosecutor correctly points out, MRE 804(b)(3) was inapplicable where the declarant, Deville, testified at trial. See also *People v Barrera*, 451 Mich 261, 268; 547 NW2d 280 (1996).

In addition, even if the proffered statements were not precluded by the hearsay rules, defendant failed to demonstrate the relevance of the statements because a future threat of harm to his brother was insufficient to allow defendant to go forward with a duress defense.

Duress is an affirmative defense wherein a defendant "admits the doing of the act charged, but seeks to justify, excuse, or mitigate it." *People v Lemons,* 454 Mich 234, 246 n 15; 562 NW2d 447 (1997); *People v Dupree*, 284 Mich App 89, 99; 771 NW2d 470 (2009). "A successful duress defense excuses the defendant from criminal responsibility for an otherwise criminal act because the defendant was compelled to commit the act; the compulsion or duress overcomes the defendant's free will and his actions lack the required mens rea." *People v Luther*, 394 Mich 619, 622; 232 NW2d 184 (1975). "It is sometimes characterized as a choice of

-5-

evils and is applicable to situations in which it is preferable, as a matter of social policy, to permit a person to commit a crime in order to avoid a greater harm." *Dupree*, 284 Mich App at 100. For that reason, duress is not a valid defense for all crimes. It is "well settled", for example, "that duress is not a defense to homicide." *People v Gimotty*, 216 Mich App 254, 257; 549 NW2d 39 (1996).

In order to successfully carry the burden of production on a duress defense, a defendant must demonstrate the following:

A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

D) The defendant committed the act to avoid the threatened harm. [*Lemons*, 454 Mich at 247.]

However, the threat must be "present, imminent, and impending" and "threat of future injury is not enough." *Id.*

The duress defense was not available to defendant even if Deville threatened to harm defendant's brother. Not only was it a future threat, but it was not a direct threat to defendant. The threatening conduct must create a reasonable fear of death or serious bodily harm in the defendant.

### III. JUDICIAL BIAS

In his Standard 4 brief, defendant argues that the trial court judge was biased against him and there should have been a change in venue.

"When this Court reviews a decision on a motion to disqualify a judge, the trial court's findings of fact are reviewed for an abuse of discretion, while the application of the facts to the relevant law is reviewed de novo." *People v Roscoe*, 303 Mich App 633, 647; 846 NW2d 402 (2014) quoting *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999).

A criminal defendant is entitled to a "neutral and detached magistrate." *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). "[A] trial judge is presumed to be impartial, and the party asserting partiality has the heavy burden of overcoming that presumption." *People v Wade*, 283 Mich App 462, 470; 771 NW2d 447 (2009). A judge may be disqualified if he is "biased or prejudiced for or against a party or attorney." MCR

2.003(C)(1)(a).[4]  "To avoid delaying trial and inconveniencing the witnesses, all motions for disqualification must be filed within 14 days of the discovery of the grounds for disqualification. If the discovery is made within 14 days of the trial date, the motion must be made forthwith." MCR 2.003(D)(1)(a).  And "the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion."  MCR 2.003(D)(2).  The issue of disqualification may be waived if a party fails to follow proper procedure.  *Davis v Chatman*, 292 Mich App 603, 615; 808 NW2d 555 (2011).

Under MCR 2.003(C)(1), disqualification of a judge is only warranted if the judge is actually biased or prejudiced for or against a party or his attorney.  *Cain v Michigan Dep't of Corrections*, 451 Mich 470, 495; 548 NW2d 210 (1996).  "Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598.  Rather, "[t]he appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial."  *Id.* (internal quotation marks omitted). Therefore, "[j]udicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible."  *Id.* (internal quotation marks omitted).

There is no evidence on the record that the trial court judge was biased against defendant in any way.

While discussing a potential plea deal, defendant's original counsel stated "my client wishes me to file a motion for change of venue as it's his belief that he's going to be unable to get a fair trial in Genesee County based on who the victim was in the case."  The trial court noted that if alleged serial killer, "Mr. Abuelazam", was able to select a jury in Genesee County, then defendant would undoubtedly be able to do so as well.  Defense counsel clarified that defendant believed that "the police, prosecutor, and actually this Court is biased against him" and "he believes he has the right to have this case removed to another legal system to be tried."  The trial court indicated that, if anything, he felt sorry for defendant and that defendant "can be assured that if he goes to trial he is going to have a fair trial in this court."  Defendant counsel did not pursue the issue at that time.

The issue was brought up again at a December 4, 2012 hearing.  Original defense counsel again indicated that defendant had requested a change of venue because he was afraid he could not receive a fair trial because of who the victim was.  Counsel discussed the matter with the prosecutors and was satisfied that "[t]he fact that [the victim is] a retired sheriff's deputy is not relevant to this case whatsoever.  And will not be brought out during the testimony while it's going on in this case."  The trial court told defendant that before a change of venue could be considered, they would have to first make an attempt to seat a fair jury.  Defendant complained

---

[4] Defendant argues that actual bias is involved and, therefore, the only subrule applicable to his argument is MCR 2.003(C)(1).

that prosecutor David Leyton was biased against him and, as a result, would likely not offer a generous plea deal. The trial court patiently explained that, quite simply, the prosecutor is entitled to be biased. The only individuals who were not allowed to be biased were the judge and jurors.

On the first day of trial, defendant's new attorney asked the trial court to revisit the change of venue and disqualification issues because "[t]he victim in this case was a well-known member of the law enforcement community; and my client feels that he could not get a fair trial in this county, in this courtroom . . ." The trial court denied the motion for a change in venue because a motion for reconsideration was not made within 21 days of his June 2012 denial of defendant's oral motion for change of venue and because there needed to first be an attempt to seat an impartial jury. Defendant again raised the issue of prosecutor bias. The trial court reminded defendant that Leyton was the prosecutor and, in some respect, had control over the case because he was responsible for charging defendant, but that defendant's ultimate sentence remained with the court. The trial court also denied the motion for recusal, finding no actual or apparent bias.

Defendant complains that the judge's decision denying his motion for change of venue was evidence of his partiality. However, as the foregoing facts demonstrate, the judge harbored no bias in denying the motion for a change of venue. A change of venue is appropriate, for example, where a defendant stands no chance of receiving a fair trial because the prospective jurors are inundated with extensive media coverage. *People v Jendrzejewski*, 455 Mich 495, 500; 566 NW2d 530 (1997). Defendant wanted a change of venue, not because he truly believed that the judge was biased or that he could not select an unbiased jury, but because he did not think the prosecutor would offer him a good deal. His motion was an attempt to avoid dealing with Leyton.

Defendant also complains that he was prevented from arguing the issue of disqualification before the chief judge. However, the record is clear that defendant never made such a request. MCR 2.003(D)(3)(a)(*i*) provides that if a trial court judge denies a motion, for disqualification then "*on the request of a party*, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo." (Emphasis added.) In fact, it is obvious that defendant was placated by the trial court's explanation for what was happening and why.

Defendant argues that the judge's bias was demonstrated by the court's refusal to allow defendant to pursue a duress defense. But, as previously discussed, a duress defense was not available to defendant under these circumstances. Moreover, even if the trial court erred in preventing defendant from presenting such evidence, "[t]he mere fact that a judge ruled against a litigant, even if the rulings are later determined to be erroneous, is not sufficient to require disqualification or reassignment." *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009).

Finally, defendant argues that the judge demonstrated bias during sentencing when the judge said that he was not impressed with defendant's duress defense and effectively sentenced defendant as though he had been found guilty of murder. Again, a trial judge's remarks that are critical of or hostile to the parties or their cases do not ordinarily establish disqualifying bias. *Jackson*, 292 Mich App at 598.

The trial court did not abuse its discretion in denying defendant's motion for disqualification. Defendant failed to follow the proper procedure and there is absolutely no record evidence of bias on the part of the trial court judge.

## IV. PROSECUTORIAL ERROR

In his Standard 4 Brief, defendant argues that the prosecutor in this case was particularly vindictive.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Where there is no contemporaneous objection or request for a curative instruction, a claim of prosecutorial error is "limited to ascertaining whether plain error affected defendant's substantial rights." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008).

First, defendant claims that the prosecutor allowed the jury to hear inadmissible hearsay. The prosecutor and defense counsel agreed that certain portions of defendant's first interview would not be played. As defense counsel explained, the omitted portions related to the fact that defendant "had engaged in previous breaking and entering before the case that we're here for today." When the tape was played for the jury, the jury heard Coon ask defendant "where did you do the other B and E at?" before the tape was paused. Later, the jury heard defendant being asked "which house was it that you broke into to get those clothes? Do you remember?" Once the jury was excused for the day, defense counsel noted that the tape indicated that defendant "did a B and E to explain the clothing that he was wearing, an earlier B and E. And so, I mean, that's out. I just – we – I just want to make a record that happened." The trial court indicated that it would give a curative instruction if defense counsel found it necessary.

It appears from the record that no such instruction was requested or given. Defendant has failed to show misconduct in the playing of those statements. "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70. There is no indication that the prosecutor intentionally played the redacted portion of the tape. If anything, the error was a combined failure on the part of the prosecutor, the trial court, and defense counsel. Defendant was not denied a fair and impartial trial for the inadvertence.

Second, defendant complains that the prosecutor revealed to the media that defendant had confessed to the crimes. This particular claim need not be addressed. Defendant provides no citation to the record that the prosecutor provided information to the media and fails to argue how the alleged revelation impacted his ability to receive a fair and impartial trial. Defendant may not simply announce his claim and leave it to this Court to discover and rationalize the basis for such a claim. *People v Kevorkian*, 248 Mich App 373, 388-389; 639 NW2d 291 (2001). Moreover, defendant's three confessions were presented to the jury, so this was not a situation in which defendant's confessions were suppressed and the jury had extrajudicial knowledge of that fact.

Third, defendant complains that the prosecutor did not allow defendant to present his duress defense. As previously stated, "[a] prosecutor's good-faith effort to admit evidence does

not constitute misconduct." *Dobek*, 274 Mich App at 70. It stands to reason that, as a corollary to that rule, a prosecutor's good-faith effort to exclude evidence cannot constitute misconduct. Moreover, defendant misapprehends the role of the prosecutor. It was the trial court judge, not the prosecutor, who rendered the ultimate decision regarding defendant's duress claim.

Finally, defendant complains that the prosecutor deliberately used perjured testimony. He argues that two witnesses lied about seeing defendant ask the victim for money and cigarettes when, in reality, defendant did not smoke. A prosecutor may not knowingly use false testimony to obtain a conviction. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2010). Prosecutors have "a constitutional obligation to report to the defendant and the trial court whenever a government witness lies under oath." *People v Lester*, 232 Mich App 262, 276; 591 NW2d 267 (1998). However, even where it can be shown that a prosecutor presented perjured testimony, "a conviction will be reversed and a new trial will be ordered . . .only if the tainted evidence is material to the defendant's guilt or punishment." *Aceval*, 282 Mich App at 389. Therefore, whether a new trial is warranted depends on the effect the misconduct had on the trial and "not on the prosecutor's . . .culpability." *Id*. at 390. Defendant fails to demonstrate that the witnesses actually lied or that the prosecutor had knowledge of the alleged perjury. More importantly, defendant fails to show how the evidence was material to his guilt, given the overwhelming evidence against him.

## V. SENTENCING ISSUES

Defendant raises a number of issues in both his brief on appeal and his Standard 4 Brief. He argues that the trial court incorrectly scored a number of offense variables (OV). He further argues that the trial court erred in finding reasons to depart from the guidelines and in departing to such an extreme extent.[5]

## A. STANDARD OF REVIEW

As it pertains to scoring the guidelines, our Supreme Court has held:

[W]hen the Legislature enacted the sentencing guidelines in 1998, it prescribed detailed instructions for imposing sentences, thereby reducing the circumstances under which a judge could exercise discretion during sentencing. Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (footnotes omitted).]

---

[5] To the extent defendant argues that the presentence information report is incorrect because it indicated that defendant's convictions included carjacking and armed robbery, the error was noted at sentencing.

As for the deviation, our Court has held:

> If the trial court departs from the sentencing guidelines, this Court reviews for clear error whether a particular factor articulated by the trial court exists. A trial court's determination that a factor is objective and verifiable presents a question of law that this Court reviews de novo. This Court reviews for an abuse of discretion the trial court's conclusion that the factors provide substantial and compelling reasons to depart from the guidelines. The trial court abuses its discretion when its result lies outside the range of principled outcomes. [*People v Anderson*, 298 Mich App 178, 184; 825 NW2d 678 (2012) (internal citations omitted) (2013).]

In determining whether there were substantial and compelling reasons to deviate from the guidelines, this Court must give "appropriate deference" to the trial court, who is in the "better position to make such a determination." *People v Babcock*, 469 Mich 247, 270; 666 NW2d 231 (2003).

## B. SCORING

### 1. OV 3

MCL 777.33(2)(b) provides that 100 points must be scored "if death results from the commission of a crime and homicide is not the sentencing offense." See also *People v Laidler*, 491 Mich 339, 344; 817 NW2d 517 (2012). Defendant was acquitted of felony murder and second-degree murder. Therefore, homicide was not the sentencing offense and the plain statutory language compelled a 100-point assessment.

### 2. OV 10

OV 10 addresses the exploitation of a vulnerable victim. The sentencing information report reveals that the trial court scored 10 points under OV 10. A trial court must score 10 points if "the offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his authority status." MCL 777.40(1)(b). However, on appeal and in the trial court, the parties focused their argument on predatory conduct. Under MCL 777.40(1)(a), a trial court must score 15 points if "predatory conduct was involved." Thus, although the sentencing information report indicates that defendant was scored 10 points under OV 10, it appears the points were assessed for predatory conduct and OV 10 should have been scored at 15 points.

Because "the central subject is the assessment of points for the exploitation of vulnerable victims," "points should be assessed under OV 10 only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *People v Cannon*, 481 Mich 152, 157; 749 NW2d 257 (2008). When determining whether "predatory conduct" is at issue, "vulnerability" does not have to be an inherent personal characteristic of the victim; instead, vulnerability may arise out of external circumstances. *People v Huston*, 489 Mich 451, 463; 802 NW2d 261 (2011). For example, by "lying in wait"

-11-

for a victim, a defendant and his cohorts made the victim more susceptible to injury or physical restraint and, therefore, more "vulnerable." *Id.* at 466. "For a trial court to assess 15 points for OV 10, the defendant's preoffense conduct only has to be directed at 'a victim,' not any specific victim, and the victim does not have to be inherently vulnerable. Instead, a defendant's 'predatory conduct,' by that conduct alone (eo ipso), can create or enhance a victim's 'vulnerability'." *Id.* at 468.

Predatory conduct "does not encompass *any* 'preoffense conduct,' but rather only those forms of 'preoffense conduct' that are commonly understood as being 'predatory' in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection." *Huston*, 489 Mich at 462. Conduct can be considered predatory even if a defendant is not targeting a specific victim. *Id.* A defendant placed himself in a better position to rob someone by "predatorily lying in wait, armed, and hidden from view" and, therefore, directed his behavior at "a victim." *Id.* at 463.

The prosecutor requested that the trial court score 10 points OV 10 for predatory conduct. The trial court agreed:

> There was testimony that . . . Mr. Robinson himself where he is alleged to have taken [] the co-defendant to show him where the house was. They then went back home. And had made plans to come back the next day apparently to actually engage in the break-in. They apparently sat around and waited until he had left. There was evidence that they had sat there and waited until he had left and then came back and actually entered into the home. So I do think that it's appropriate to score him the ten points for predatory conduct because it does appear that they were – their actions involved predatory – was predatory in nature. So I would score offense variable 10 ten points.

Clearly, lying in wait is predatory conduct. *Huston*, 489 Mich at 463. Predatory conduct inherently involves some level of exploitation, and a court is not required to explicitly determine whether exploitation otherwise occurred. *Cannon*, 481 Mich at 159. OV 10 should have been scored at 15 points.

### 3. OV 12

OV 12 addresses contemporaneous felonious criminal acts. Under MCL 777.42(1) a trial court must assess five points "when two contemporaneous felonious criminal acts involving other crimes were committed." A felonious criminal act is contemporaneous if the act occurred within 24 hours of the sentencing offense and it has not and will not result in a separate conviction. MCL 777.42(2)(a). "[W]hen scoring OV 12, a court must look beyond the sentencing offense and consider only those separate acts or behavior that did not establish the sentencing offense." *People v Light*, 290 Mich App 717, 722; 803 NW2d 720 (2010).

Defendant did not object to the scoring in the trial court. Only on appeal does defendant argue that the trial court erred in scoring OV 12 because the score was based on charges for which defendant had been acquitted. However, as previously stated, a trial court's factual

determinations at sentencing must only be supported by a preponderance of the evidence. *Hardy*, 494 Mich at 438. Defendant seems to argue that the trial court's use of acquitted charges to score OV 12 violates *Alleyne v United States*, ___ US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2014). However, in *People v Herron*, 303 Mich App 392, 405; 845 NW2d 533 (2013), this Court held that *Alleyne* does not apply to Michigan's legislative sentencing guidelines:

> We hold that judicial fact-finding to score Michigan's guidelines falls within the wide discretion accorded a sentencing judge in the sources and types of evidence used to assist the court in determining the kind and extent of punishment to be imposed within limits fixed by law. Michigan's sentencing guidelines are within the broad sentencing discretion, informed by judicial factfinding, that does not violate the Sixth Amendment. [Internal quotation marks and citations omitted.]

This Court is bound to follow *Herron*. MCR 7.215(J)(1).

#### 4. OV 14

OV 14 addresses the offender's role. Under OV 14, a court must assess 10 points when the defendant "was a leader in a multiple offender situation." MCL 777.44(1)(a). "[T]he plain meaning of 'multiple offender situation' as used in OV 14 is a situation consisting of more than one person violating the law while part of a group." *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350, vacated in part 494 Mich 880 (2013).

The prosecutor further requested that the trial court score OV 14 at 10 points because of defendant's leadership role in the crime. The trial court agreed:

> I do think that when you look at the facts, Mr. Robinson can be considered a leader. Mr. Robinson is the one who lived across the street from the [victim] at some point in time. Mr. Robinson is the one who had been to his home at previous occasions seeking to get money from him that had had the opportunity to see inside his home and you know how this home was set up, I mean, there was clutter everywhere. There was stuff everywhere. If you stepped inside and looked inside this house you're going to see jars of money, you're going to see items worth stealing. And Mr. Robinson was the one who had the opportunity. Mr. Robinson's own testimony was that it was he who took his co-defendant to find out where the house was. The co-defendant didn't know anything about his house. He didn't know where it existed. It was Mr. Robinson who took him there and showed him where the house was. Now I know the theory that you guys wanted to argue which was inappropriate to bring before this jury but the bottom line is Mr. Robinson is the one who – who was later found driving around in his car. Mr. Robinson was the one who had all the coins. . . . But the bottom line is Mr. Robinson is the one who is driving around in his truck, . . . Mr. Robinson clearly was a leader in this incident and he ought to be scored as a leader. So I would score OV 14, I think you said, as ten points.

Thus, while defendant may not have been the one who shot the victim, he played the lead role in targeting the victim for the robbery. "The entire criminal transaction should be considered when

scoring this variable." MCL 777.44(2)(a); *People v Lockett*, 295 Mich App 165, 184; 814 NW2d 295 (2012).

Except for OV 10, which was scored at 10 instead of 15, the trial court otherwise correctly scored the offense variables. In any event, as defendant concedes, an erroneous scoring of the guidelines range does not require resentencing if the error did not alter the recommended minimum range. *People v Phelps*, 288 Mich App 123, 136; 791 NW2d 732 (2010).

## C. GUIDELINES DEPARTURE

"A court may depart from the appropriate sentence range established under the sentencing guidelines . . . if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure." MCL 769.34(3). "[A] substantial and compelling reason must be construed to mean an objective and verifiable reason that keenly or irresistibly grabs our attention; is of considerable worth in deciding the length of a sentence; and exists only in exceptional cases." *People v Babcock*, 469 Mich 247, 257; 666 NW2d 231 (2003) (internal quotation marks omitted). To be objective and verifiable, the factors must be actions or occurrences external to the mind and must be capable of being confirmed. *People v Horn*, 279 Mich App 31, 43; 755 NW2d 212 (2008). The court may draw inferences about the defendant's behavior from the objective evidence. *People v Petri*, 279 Mich App 407, 422; 760 NW2d 882 (2008).

Not only must there be substantial and compelling reasons to depart from the guidelines, but the ultimate "minimum sentence imposed must be proportionate to the defendant's conduct and prior criminal history." *People v Smith*, 482 Mich 292, 300, 305; 754 NW2d 284 (2008). To be proportionate, the sentence must be more appropriate to the offense and the defendant than a sentence within the guidelines range would have been. *Id.* at 318. "The court shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight." MCL 769.34(3)(b).

At sentencing, the prosecutor argued that there were substantial and compelling reasons for the trial court to make an upward departure from the sentencing guidelines. Defendant admitted to committing another break-in only a month before these crimes occurred. That crime also involved a victim whom defendant knew – a former teacher – and she returned while the robbery was in progress. Nevertheless, defendant did not learn from this prior experience. The prosecutor pointed out that the psychological injury to the family was not adequately considered in the guidelines. She indicated that defendant and Deville made the crime all the worse by pouring bleach over the victim. Then, after killing the victim, defendant and Deville spent a significant amount of time ransacking the house. The prosecutor argued that the guidelines did not consider defendant's intent to kill, regardless of the fact that the jury acquitted defendant of murder. She requested that the home invasion count run consecutively to defendant's other counts. Defense counsel objected, arguing that the prosecutor was attempting to punish defendant for failing to take the plea agreement.

-14-

In sentencing defendant, the trial court noted that the offense was particularly "egregious" and included "predatory conduct." Defendant and Deville "didn't just shoot and kill him, they shot and killed him, walked over his body, robbed him, put him on the couch, poured bleach on him, and then cleaned out his house." Striking to the court was the fact that defendant then proceeded to drive around town in the victim's truck. The trial court rejected defendant's claim that he had been coerced into committing the crimes:

> There was this claim that he had been coerced in[to] committing this crime but he went and picked up the co-defendant who he claimed was threatening him to commit this crime and took him to a party that night. And then I think in fact dropped him off, so there's just the evidence is just in this Court's opinion overwhelming that Mr. Robinson was knee deep in this crime and, you know, again, I don't criticize jurors in their decisions but for the life of me I cannot understand why they did not convict him of first degree murder, you know, anything I can assume is that as I indicated [defense counsel] gave a[n] explanation for how the victim died that would – that could have led the juror to believe that it was something that was decided after the victim had come into the house the shooting occurred and because the co-defendant was the one who actually pulled the trigger and admitted to pulling the trigger that that was a problem but I also think that one of the other things that came out in the trial that might have helped Mr. Robinson is the fact that the co-defendant pled to second degree murder . . . I think jurors sometimes because they hear the co-defendant gets a deal that they believe that because the co-defendant was the actual shooter that maybe Mr. Robinson should not be found any more blame worthy them [sic] the person who actually pulls the trigger . . .

Finding that defendant was "knee deep involved in this offense," the trial court agreed that it was appropriate to exceed the guidelines and "I would adopt the statements" the prosecutor made for finding substantial and compelling reasons to exceed the guidelines. The trial court added:

> I am going to make the home invasion consecutive to all the other counts because I think that's appropriate because I do think punishment is important in this particular case because this involved a death of an individual who had shown himself to [be a] . . . contributor to society. He had reached his [] his old age had reached retirement. And come home and to be killed in his own home by two individuals who were trying to rob him. This Court thinks that that's just totally egregious. It was totally unnecessary. I think that the factors that the prosecution has laid on the record as to why the Court should exceed the guidelines also justify running the home invasion consecutive to the other offenses in this case[.]

The trial court, in adopting the prosecutor's arguments and making its own statements on the record, articulated substantial and compelling reasons for departing from the sentencing guidelines.

Although defendant's criminal history was scored under PRV 7, it is noteworthy that defendant committed a home invasion just one month prior to this case. As in the case at bar, the victim of the prior home invasion was someone known to defendant. And, as in this case, the

-15-

victim returned home while the robbery was in progress. The prior home invasion undercuts defendant's claim that he and Deville were shocked and surprised at the fact that the victim returned home during the robbery. Defendant was well aware of the risk that the victim would return home and simply ignored it. Therefore, PRV 7 did not give sufficient weight to the facts surrounding defendant's prior conviction.

It was proper for the trial court to consider the psychological suffering to the victim's family. OV 5 permits scoring for psychological injury to a member of a victim's family. MCL 777.35(1). However, OV 5 only applies if the offense is homicide, attempted homicide, or conspiracy or solicitation to commit homicide or assault with intent to commit murder. MCL 777.22(1). Defendant was acquitted of the homicide charges and, therefore, psychological damage to the victim's family was not scored under OV 5. The guidelines did not give sufficient weight to the psychological harm to the victim's family.

Pouring bleach on the victim after he was already dead and staying in the home to finish the robbery are two additional circumstances that "keenly or irresistibly grabs our attention; is of considerable worth in deciding the length of a sentence." The actions show a level of callousness not adequately provided for in the guidelines.

The trial court also gave proper weight to the charges for which the jury acquitted defendant. The trial court's finding that defendant was "knee deep" in everything that occurred is verified by the testimony given at trial.

It is clear from the record that the trial court had substantial and compelling reasons to deviate from the sentencing guidelines. The only issue remaining is the extent of the departure and whether the resultant sentence was proportionate. The statutory minimum range for first-degree home invasion was 57 to 95 months. The trial made an upward departure and imposed a 144 to 240 month sentence. The statutory range for safe breaking was 43 to 86 months. The trial court made an upward departure and imposed a 140 to 360 month sentence.

The trial court did not specifically state how the extent of the departure was proportionate. "[I]f it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified. A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear. When departing, the trial court *must* explain why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been." *Smith*, 482 Mich at 304 (emphasis added). Thus, while there is sufficient record evidence to support a departure from the recommended guidelines, the matter must be remanded. Upon remand, the trial court shall articulate how its sentence was more proportionate than a sentence within the guidelines.

To the extent defendant complains that the consecutive nature of the sentences rendered his overall sentence disproportionate, this Court has held that "[i]n determining the proportionality of an individual sentence, this Court is not required to consider the cumulative length of consecutive sentences." *People v St John*, 230 Mich App 644, 649; 585 NW2d 849, 852 (1998).

We affirm defendant's convictions and remand for resentencing so that the trial court may justify the extent of the departure from the sentencing guidelines. We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Donald S. Owens
/s/ Kirsten Frank Kelly